UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In re:

KEITH T. and CAROLYN J. HAGENEY,

      Debtors.

Case No. 08-04506-PCW7

MEMORANDUM DECISION RE:
U.S. TRUSTEE'S MOTION TO
DISMISS FOR ABUSE

PATRICIA C. WILLIAMS, Presiding Judge

      THIS MATTER comes before the Court on the U.S. Trustee's Motion to Dismiss the Chapter 7 for Abuse pursuant to 11 U.S.C. § 707(b). The U.S. Trustee is seeking a finding of abuse under the provisions of both § 707(b)(2), which provides for a statutory presumption of abuse in certain cases, and § 707(b)(3), which provides for a finding of abuse when either (a) the debtor has filed the petition in bad faith, or (b) the totality of the circumstances of the debtor's financial situation demonstrates abuse.

**ISSUE**

      The U.S. Trustee argues that this case should be dismissed or converted to a Chapter 13 as 11 U.S.C. §§ 707(b)(2) and (b)(3) preclude the granting of relief in this Chapter 7. Pre-BAPCPA, there was a single test set forth in § 707(b) to determine whether the granting of Chapter 7 relief would be a "substantial abuse" of the bankruptcy system. Although the burden of proof remains on the moving party, after the statutory modifications contained in BAPCPA, the standard to be met by the party seeking dismissal of the Chapter 7 under § 707 was lowered from substantial abuse to abuse. In re Siegenberg, 2007 WL 6371956 (Bankr. C.D. Cal 2007); In re Harris, 279 B.R. 254 (B.A.P. 9th Cir. 2002). The statute now provides two different tests to determine whether abuse is present. The means test in § 707(b)(2) applies a formulaic approach to determine if a debtor is above or below median income. If found to be above median income, it is presumed to be an abuse to allow the granting of Chapter 7 relief. If no presumption arises as the debtor is below median income, the test for abuse under

MEMORANDUM DECISION RE: . . . - 1

§ 707(b)(3) is applicable. <u>In re Pak</u>, 343 B.R. 239 (Bankr. N.D. Cal. 2006); <u>In re Egebjerg</u>, 574 F.3d 1045 (9th Cir. 2009).

The court in <u>In re Jensen</u>, 407 B.R. 378, 384 (Bankr. C.D. Cal. 2009) stated:

> The Court agrees with those authorities holding that the Means Test is only the first step in determining whether a debtor's petition is abusive. The Means Test functions as an initial screen to weed out those Chapter 7 petitions that are most clearly abusive. As one court explains, 'Congress intended that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a chapter 7 petition.' *In re Fowler*, 349 B.R. 414, 420-21 (Bankr. D. Del. 2006). However, as with any bright-line rule, the Means Test presumption does not always provide the most accurate snapshot of the debtor's financial situation. That is to be expected; a formula complex enough to accurately predict every single debtor's ability to pay would be impossible to effectively administer. The Means Test sacrifices some level of accuracy in the interest of administrative efficiency.
>
> Fortunately, the Bankruptcy Code anticipates that the Means Test alone cannot eliminate every single abusive filing and provides a backstop, the § 707(b)(3)(B) totality of the circumstances test. The totality of the circumstances test is best seen as providing a chance for the Court to refine the Means Test estimate. Since it permits individualized case-by-case examination, the totality of the circumstances test can weigh unusual circumstances that the Means Test does not-and could not reasonably be expected to- account for.

In the current situation, the U.S. Trustee argues that application of the means test per § 707(b)(2) results in a presumption of abuse as the debtors are above median income. Alternatively, if the debtors are found to be below median income and the presumption is inapplicable, § 707(b)(3) precludes the granting of Chapter 7 relief.

## MEANS TEST PRESUMPTION
## 11 U.S.C. § 707(b)(2)

The debtor husband was self-employed as an insurance broker and agent until late in the summer of 2008 when he became an independent contractor with American General Insurance ("American General"). That relationship resulted in monthly income of $8,000 beginning in August, 2008. The debtor's income from the prior self-employment had been considerably less than $8,000. The Chapter 7 was filed October 30, 2008. Pursuant to the means test, a debtor's ability to repay creditors is based upon a formula which considers income as the average income earned by the debtor in the six months prior to filing the bankruptcy. When a debtor's income fluctuates due to change of employment, loss of job or other reasons, application of the formula often has no relationship to a debtor's actual ability to pay. However, that is the calculation Congress mandated in § 707(b)(2) and is the calculation

MEMORANDUM DECISION RE: . . . - 2

performed to determine whether a presumption of abuse exists.

Application of the "means test" formula in the Form B22A for these debtors results in an income which is below median. For four of the six months prior to filing, the debtor had low income and for the two months immediately prior to filing, he was receiving the higher income from American General. By filing the bankruptcy on October 30, 2008, only the higher American General income from August and September became part of the formula. If the Chapter 7 had been filed two days later, on November 1, 2008, the Form B22A would have reflected three months of lower income and three months of the higher American General income, resulting in the debtors being above median income.

The U.S. Trustee argues that the commencement of the case on October 30, 2008, rather than November 1, 2008, was an improper manipulation of the means test. The Code sets forth the formula and formulas are subject to manipulation. The Code allows a debtor to choose the date of the commencement of the case. Any litigant may seek to maximize their legal rights and to enforce those rights to the extent allowed in the law. Choosing to commence the Chapter 7 on October 30, 2008, rather than November 1 is not an indicia of bad faith, but an acceptable exercise of rights granted under the Code. The debtor's election to commence a bankruptcy on a particular day may affect the presumption arising under § 707(b)(2), but that is the result of the application of the statutory formula. A debtor should not be penalized for choosing to commence the bankruptcy proceeding on a date which maximizes the debtor's rights under the statute.

Another issue relating to § 707(b)(2) is the debtors' deduction of business expenses on the Form B22A. Expenses under the "means test" formula for self-employed debtors is determined by reference to the "Other Necessary Expenses" section of the IRS Financial Analysis Handbook, but limits those expenses to those actually incurred by the debtor. The "Other Necessary Expense" guideline applicable to this case allows business expenses which are necessary "for the production of income" and "if the taxpayer substantiates and justifies the expenses."

The Amended Form B22A averages the income from the six months pre-petition at $6,080 and then deducts $2,051 on line 4 (b) as an ordinary and necessary business expense. The Schedule "J" filed with the original Chapter 7 petition references monthly business expenses of $1,559. Exhibit "J," introduced at the evidentiary hearing, is an accounting of the six months actual pre-petition business

MEMORANDUM DECISION RE: . . . . - 3

expenses. The expenses for the six months pre-petition were as follows: April $2,767; May $3,613; June $1,827; July $2,917 (all of which were prior to the relationship with American General); August $1,182; and September $1,189. The average monthly expenses per that exhibit was $2,250, which is $200 a month more than the amount deducted on the Form B22A. The evidence indicated that business expenses had varied from month-to-month and continued to do so. The self-employment prior to the relationship with American General was, according to the debtors, "not profitable" causing financial stress.

The itemization reflected on Exhibit "J" includes items, such as telephone, advertising, license and internet service, all of which are related to the business activities of the debtor, both while self-employed and in the new relationship with American General. Although the debtors deducted some portion of their mortgage as a business expense from federal income taxes, no such expense is shown on Exhibit "J." Both the prior self-employment and the relationship with American General require travel by the debtor, although the nature and frequency of the travel changed. For purposes of the "means test" which utilizes the "Other Necessary Expense" guideline of the IRS, the debtors have substantiated the necessity of their deduction of $2,051 on the Form B22A and that the amount of the expense was justified.

Allowing the deduction of the $2,051 business expense from the debtors' income of $6,080 results in the debtors being below median income. Thus, no presumption of abuse arises under 11 U.S.C. § 707(b)(2).

## **TESTS WHEN PRESUMPTION DOES NOT ARISE**
## **11 U.S.C. § 707 (b)(3)**

To determine whether the commencement of a Chapter 7 by below median income debtors constitutes abuse, 11 U.S.C. § 707(b)(3) must be examined. If application of the means test results in a determination of below median income status, the determination of abuse is made on a case-by-case basis after a comprehensive review of the facts presented by the specific case. In re Lamug, 403 B.R. 47 (Bankr. N.D. Cal. 2009).

11 U.S.C. § 707(b)(3) provides that when no presumption arises under § 707(b)(2), the court should consider

MEMORANDUM DECISION RE: . . . - 4

(A) whether the debtor filed the petition in bad faith; or
(B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

The commencement of a bankruptcy proceeding under any chapter of the Code must be consistent with bankruptcy policy and the goals of providing a fresh start to honest but unfortunate debtors, while maximizing repayment to creditors. If a bankruptcy proceeding is not consistent with bankruptcy policy and goals or is filed for an improper purpose, it is an abuse of the bankruptcy system and the Bankruptcy Code. In re Mitchell, 357 B.R. 142 (Bankr. C.D. Cal. 2006). 11 U.S.C. § 707(b)(3) sets forth two separate and independent tests to determine whether abuse exists in the Chapter 7 context. If the filing fails either test, the Chapter 7 must be dismissed or converted to a Chapter 13.

By use of different language in §§ 707(b)(3)(A) and (B), Congress intended two different tests to be utilized in examining whether abuse exists. The first test requires a finding of bad faith on the part of the debtor. The second test requires a finding of abuse based upon the specific debtor's financial situation. The differences in the two tests are both temporal and evidentiary. If Congress uses particular language in one section of a statute, but omits it in another, it must be presumed that Congress acted intentionally. In re Egebjerg, supra. Subsection (A) refers to the debtor's filing of the petition. Thus, the statutory language establishes the time at which the bad faith must exist. Subsection (B) makes no reference to any particular time frame and requires an examination of the totality of the debtor's financial circumstances.

## WAS THE BANKRUPTCY PETITION FILED IN BAD FAITH?

The statutory language of subsection (A) of § 707(b)(3) requires the bad faith to exist at the time of commencing the bankruptcy and it is the debtor's intent and purpose at that time which is the subject of the analysis. The inquiry is focused upon the debtor's conduct. Bad faith may involve a dishonest debtor or nefarious acts, but such motivation or intent is not necessary. Bad faith exists if the filing of the bankruptcy was for a purpose not consistent with the Bankruptcy Code or policy even though the purpose may otherwise be lawful. In re Siegenberg, supra. Absent allegations of subjective intent to commit wrongful acts, the evidence relevant to the determination of bad faith is the evidence which

MEMORANDUM DECISION RE: . . . - 5

existed at the time of filing the petition.[1] Evidence relevant to an examination of bad faith under § 707(b)(3)(A) may be the filing of incomplete schedules or the existence of a voidable transfer prior to filing the case, but the inquiry focuses on the debtor's conduct, not the debtor's financial affairs. In re Honkomp, 416 B.R. 647 (Bankr. N.D. Iowa 2009).

In this situation, the U.S. Trustee's allegation of bad faith arises from the commencement of the bankruptcy on October 30, 2008, rather than November 1, 2008, the fact that the debtors argued that the income from American General should be classified as a loan rather than income and the pre-petition acquisition of certain vehicles. As previously discussed, the debtors' selection of the date to commence the case is not an indicia of bad faith. Previously, the court determined that although the contract between American General and the debtor labeled the monthly payments as loans and, although the sums advanced by American General are eventually deducted from debtor's commission income, the monthly payments of $8,000 are income for purposes of the means test. The debtors' legal arguments were not frivolous and a bona fide dispute existed as to the nature of the monthly payment by American General. The debtors' litigation of the dispute is not an indicia of bad faith even though the issue was resolved adverse to the debtors.

The transactions regarding the vehicles began in January of 2008, approximately ten months prior to filing. In January of 2008, the debtor husband was acting as a self-employed insurance broker and selling health insurance policies in various western states which required him to travel thousands of miles per year in his personal vehicle. While traveling in Wyoming, his 2006 Dodge Ram pickup was destroyed in an accident. Faced with an immediate need for a replacement vehicle in a town with one car dealership and a need for a vehicle suitable for severe driving conditions, the debtor purchased a 2008 Dodge Ram pickup for $63,995. This is considered a luxury vehicle and the debtor could have purchased a suitable vehicle with lower operating costs for a smaller purchase price. The debtor could have made a more financially responsible decision, but under the circumstances, the debtor's decision regarding the purchase was not unreasonable.

The testimony at trial indicated that at that time the business was making a small profit.

---

[1] Evidence of conduct post-petition may be relevant in determining motive or subjective intent, which existed at the time of filing, but no such allegations exist in this case.

MEMORANDUM DECISION RE: . . . - 6

Sometime after the accident, the business became "stagnant," meaning that it was "just breaking even." As the year progressed, the business became unprofitable. The debtor owned a Victory 2007 motorcycle. Because it could not be used in the winter, in April, 2008, the debtor used it for a down payment on a new 2009 Toyota Corolla for $20,000, using that as the family's second vehicle. The value of the motorcycle did not equal the lien amount. The amount financed for the Toyota was $27,000.

Also, in the spring of 2008, the debtors attempted to sell the family home. They were contemplating a move to Montana to decrease business expenses or relocate to a smaller, less expensive home without office space. Although they were then current on their payment obligations, they were having difficulties making their monthly financial obligations. The home is a relatively expensive home, which is also used as the location of the debtor's business, and, when acquired, included space for a dependent. The debtors had no equity in the home and no offers were received to purchase the home. At that time, the debtors consulted an attorney regarding the possibility of a bankruptcy filing. They decided to continue without bankruptcy protection while the husband continued to seek new employment and attempted to make his current business more profitable. The debtors were unable to sell the family home. During the early summer of 2008, they were negotiating with the mortgage lender for a loan modification to reduce their monthly mortgage payments as they had become delinquent in the payments. The modification was effectuated a few weeks prior to the commencement of the bankruptcy.

Beginning in August of 2008, the debtor obtained his position with American General as an independent contractor managing its insurance agents. His compensation was set at $8,000 per month, but the set amount declined over a period of four years as it was gradually to be replaced with compensation based upon commissions. The $8,000 per month was significantly more after expenses than the debtor had been making in his business. On August 15, 2008, approximately 10 weeks prior to commencing the Chapter 7, the debtor husband purchased a new 2009 Victory motorcycle for approximately $20,000. Despite the fact he had only four months previously traded a motorcycle for the Toyota as the motorcycle was impractical, the debtor justified the purchase of the new motorcycle as an attempt to save money. The travel requirements for American General were occasional plane

travel with once or twice a month short trips in the State of Washington. The debtor planned to use the 47 gallons per mile motorcycle rather than the 17 gallons per mile Dodge Ram and thus reduce travel expense.

This was a purchase of a luxury good which was unnecessary and merely increased the debtors' monthly payment obligations. Undoubtedly, this purchase occurred in the euphoria of obtaining an increased, set monthly income, but was not just unwise, it was irresponsible. The purchase occurred a mere 10 weeks prior to the filing of the Chapter 7 and at a time when the debtors were not only having difficulty meeting their monthly payment obligations but were in default on their home mortgage. The purchase was approximately four months after the debtor used his prior, older motorcycle as a trade-in on the Toyota, admittedly in part, as a motorcycle is not practical. This new motorcycle was the third vehicle for a family of two. The purchase occurred approximately four months after consulting an attorney regarding a possible bankruptcy filing. This purchase of this unnecessary luxury item merely worsened the debtors' insolvency and occurred at the expense of the debtors' unsecured creditors. Such a purchase must result in a determination of bad faith under § 707(b)(3)(A).

## **DOES THE TOTALITY OF THE DEBTORS' FINANCIAL SITUATION DEMONSTRATE ABUSE?**

Subsection (B) of § 707(b)(3) contains no temporal limitation. By excluding the language in § 707(b)(3)(A) referring to the date of the filing of the petition, Congress intended some other relevant time frame to apply in (B). Congress could have referred to the six months period pre-petition as it did in § 707(b)(2), but it did not. Absent statutory direction as to the temporal aspect of the determination, the inquiry and determination is made at the time of the evidentiary hearing. In re Schubert, 384 B.R. 777 (Bankr. S.D. Ohio 2008).

The language used by Congress requires the examination under this subsection to be an examination of the debtor's "financial situation." Congress could have referred back to the "current monthly income" and "applicable expense amounts" referenced in § 707(b)(2), but did not. Congress used the term "financial situation," and different words must be presumed to have different meanings. Egebjerg, supra. Once the debtor is determined to be below median income and no presumption arises, § 707(b)(3)(B) requires the examination to be of the debtor's entire financial circumstances. A debtor's

MEMORANDUM DECISION RE: . . . - 8

financial situation certainly includes actual as well as projected monthly income and expenses, but includes other factors indicative of a debtor's financial well-being. For example, an examination of a debtor's financial situation could include an examination of any equity in real property and the amount of exempt property available for the support of the debtor.

The test of "totality of the circumstances" referenced n the § 707(b)(3)(B) is a codification of prior standards utilized in the Ninth Circuit and elsewhere. In re Burge, 377 B.R. 573 (Bankr. N.D. Ohio 2007); In re Pak, supra; In re Lamug, supra; In re Baeza, 398 B.R. 692 (Bankr. E.D. Cal. 2008). In considering whether the commencement of a Chapter 7 is an abuse of the bankruptcy process, pre-BAPCPA law is still relevant in determining whether abuse exists under this subpart of BAPCPA.

> Bankruptcy courts that have addressed § 707(b)(3) since the enactment of BAPCPA have found that the 'totality of the circumstances' tests that were applicable under the former § 707(b) remain applicable under BAPCPA. *Mitchell,* 357 B.R. at 150, 153; *In re Richie*, 353 B.R. 569, 575 (Bankr. E.D. Wis. 2006). BAPCPA made changes, however, making it easier for the UST to prove a case for abuse because (a) there is no longer a presumption in favor of granting relief to a debtor, and (b) the standard for dismissal is reduced from 'substantial abuse' to mere 'abuse.' *In re Colgate*, 2007 WL 1649103 at *3 (Bankr. E.D.N.Y. 2007); *Mitchell*, 357 B.R. at 153; *Richie*, 353 B.R. at 574.

In re Siegenberg, supra, at p. 6.

The original Schedule "I" filed October 30, 2008, reflects the income of $8,000 per month and expenses of $7,669, resulting in a disposable income of $330 per month available to pay unsecured creditors which total approximately $97,000. The ultimate question presented when considering abuse under subsection (B) is whether the debtors have an ability to repay creditors. In re Baeza, supra.

At the hearing in the fall of 2009, the debtors' expenses had been reduced. The motorcycle which required monthly payments of $259 and Toyota which required payments of $466 had been surrendered. The terms of the home mortgage has been renegotiated bringing the debtors current on that obligation. The monthly income from American General had been reduced to $6,700. The debtor has now had a year to build new commission income arising from the relationship with American General and, although the regular monthly income from American General will gradually reduce, the amount of commission income will gradually increase. In re Jensen, supra.

The totality of circumstances indicate that the debtors' current financial situation is such that they should be able to make some payment to unsecured creditors.

MEMORANDUM DECISION RE: . . . . - 9

**CONCLUSION**

The court finds that the purchase of an unnecessary luxury, a good 10 weeks prior to bankruptcy at a time when monthly obligations were not being met, is conduct which gives rise to a finding of bad faith. Although there was no intention to harm or defraud creditors, bad faith under § 707(b)(3)(A) is present. The court also finds that under § 707(b)(3)(B), the totality of the circumstances indicate that the debtors have some ability to repay creditors. The statute provides that cases such as this will be dismissed or, with the debtors' consent, may be converted to a Chapter 13. Whether the debtors could confirm a Chapter 13 plan and the terms of any such plan are not relevant to this analysis. However, the debtors should be given a choice to convert to a Chapter 13 before the pending Chapter 7 is dismissed. Consequently, the debtors have 10 days after entry of this decision to elect to convert to a Chapter 13 and, if no such election is made, the court will enter an order dismissing the case.

*/s/ Patricia C. Williams*
Patricia C. Williams
Bankruptcy Judge

12/30/2009 09:16:30

MEMORANDUM DECISION RE: . . . - 10